**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X

IN RE METHYL TERTIARY BUTYL
ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION

**OPINION AND ORDER**

**00 Civ. 1898 (SAS)**

-------------------------------------------------------- X

**This Document Relates to:**

-------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9 7 10

**CITY OF NEW YORK,** *et al.,*

            **Plaintiffs,**

     **- against -**

**04 Civ. 3417 (SAS)**

**EXXON MOBIL CORPORATION,** *et al.,*

            **Defendants.**

-------------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

In this consolidated multi-district litigation ("MDL"), plaintiffs seek

relief from contamination, or threatened contamination, of groundwater from

various defendants' use of the gasoline additive methyl tertiary butyl ether

("MTBE") and/or tertiary butyl alcohol, which is a product formed by the natural

degradation of MTBE in water. Plaintiff, the City of New York ("City"),[1] filed an

action against various defendants – including the only defendants remaining in

this case, ExxonMobil Corporation, ExxonMobil Oil Corporation, and Mobil

Corporation (collectively, "ExxonMobil") – in 2003. Because of the size and

complexity of this case, five of the dozens of wells at issue were selected for a

"bellwether" trial. On October 19, 2009, after an eleven week trial, a jury awarded

the City approximately one hundred and four million dollars. ExxonMobil has

now renewed its motion for judgment as a matter of law on the City's claims and

moved, in the alternative, for a new trial and/or remittitur.

## II.    BACKGROUND

The City asserts both state law tort claims and a federal law claim

under the Toxic Substances Control Act ("TSCA") against ExxonMobil.

However, because the TSCA claim is not specific to the five focus wells at issue in

this case, only the state claims were tried. Although the trial was originally

divided into four phases, because I dismissed the City's punitive damages claim as

---

[1]    In July 2009, the New York City Water Board and the New York City
Municipal Water Finance Authority were ordered to join this action as plaintiffs
pursuant to Fed. R. Civ. P. 19(a)(2). *See* 7/6/09 Order. I will refer to the three
plaintiffs collectively as the "City."

a matter of law,[2] only three phases were tried.

## A.    Phase I

All five focus wells are located within an uncompleted facility in Jamaica, Queens known as "Station 6" that is not presently, and has never been, used to distribute water to New York City residents. Because the City is not presently using the Station 6 wells, the jury was asked in Phase I to determine whether the City intended to use Station 6 in the future. Specifically, the jury was asked (1) "whether the City has proven by a preponderance of the evidence that it intends in good faith to begin construction of the Station 6 facility within the next 15 years"[3] and (2) "whether the City has proven by a preponderance of the evidence that it intends in good faith to use the water from the Station 6 wells within the next 15 to 20 years, either to supply drinking water to its residents or to serve as a backup source of drinking water in case of shortage of supply."[4] The jury answered "yes" to both questions, but determined that the City only intends to use the Station 6 wells *as a backup source* of drinking water.[5]

---

[2]     *See generally In re MTBE Prods. Liab. Litig.*, No. 00 Civ. 1898, 2009 WL 3347214 (S.D.N.Y. Oct. 19, 2009).

[3]     8/9/09 Trial Transcript ("Tr.") at 915:7-10.

[4]     *Id.* at 917:3-8.

[5]     *See* 8/12/09 Tr. at 1049:7-1050:1.

## B.    Phase II

In Phase II, the jury was asked to make several findings relating to whether there will be any MTBE in the Station 6 wells if and when the City begins to use them as a backup source of water. These interrogatories were modeled around a series of rulings I made prior to trial. *First*, the City is not injured by the mere presence of MTBE in the groundwater. Instead, "the City is injured by a concentration of MTBE in the groundwater [only] if a reasonable water provider would take action to monitor, test and/or treat groundwater containing that level of MTBE."[6] New York state has set a Maximum Contaminant Level ("MCL") for MTBE in drinking water of ten parts per billion ("ppb").[7] As such, the City is injured as a matter of law when the contamination in the combined outflow of the Station 6 wells exceeds ten ppb. If, however, the concentration level in the combined outflow of the Station 6 wells is at or below ten ppb, whether the City

---

[6]    *In re MTBE Prods. Liab. Litig.*, No. 00 Civ. 1898, 2009 WL 2634749, at *3 (S.D.N.Y. Aug. 25, 2009).

[7]    *See* 10 N.Y. Comp. Codes R. & Regs. § 5-1.1(a1) (2006) ("MCL means the maximum permissible level of a contaminant in water which is delivered to any user of a public water system."); *id.* at § 5-1.52, Table 3 (setting the MCL at ten ppb).

has suffered an injury is a question of fact properly decided by the jury.[8]

*Second*, although the sufficiency of the City's injury is *measured* by the amount of MTBE in the combined outflow of the Station 6 wells, the *location* of that injury is the groundwater that will be drawn into the Station 6 wells when they begin operation.[9] This area is known as the "capture zone" of the Station 6 wells. Thus, "[if] the City can show that its wells will become injured immediately upon turning them on," *i.e.*, that MTBE is within the Station 6 capture zone, "it need not go through the curious exercise of turning the wells on to injure itself."[10]

The jury was asked two questions corresponding to these holdings. It was first asked "whether the City has proven, by a fair preponderance of the credible evidence, that MTBE will be in the groundwater of the capture zone of the Station 6 wells when they being operating as a backup source of drinking water."[11] It was then asked "at what peak level MTBE will be found in the

---

[8]     *See In re MTBE Prods. Liab. Litig.*, 458 F. Supp. 2d 149, 159 (S.D.N.Y. 2006).

[9]     *See In re MTBE Prods. Liab. Litig.*, 591 F. Supp. 2d 259, 275 (S.D.N.Y. 2008) ("[T]he place the harm or risk of harm occurred is the capture zone of each well, where the MTBE now contaminating the well must have first contaminated the groundwater."); *In re MTBE*, 2009 WL 2634749, at *2 n.21.

[10]    *In re MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d 446, 458 n.77 (S.D.N.Y. 2009).

[11]    8/24/09 Tr. at 2613:11-15.

combined outflow of the Station 6 wells and when that will occur."[12]  In answering

the latter question, the jury was directed to select one of several concentration

ranges: less than one ppb; one to three ppb; three to five ppb; five to ten ppb; or

more than ten ppb.[13]

       The City introduced the testimony of its hydrogeology expert, David

Terry, to aid the jury in answering these questions.  Terry explained to the jury that

he had created two groundwater models designed to evaluate how MTBE will

impact Station 6.  He created a flow model, which shows "where the groundwater

flows" and "how fast it moves,"[14] to predict the likely size and shape of the Station

6 capture zone.  This model relied on the "proposed pumping scenario" – e.g., the

location of the pumping wells, the pumping rates of the wells, and the schedule on

which the wells would pump – provided by New York City planners for both the

Station 6 wells and other surrounding wells.[15]  As Terry explained, the size and

---

[12]    *Id.* at 2614:9-12.

[13]    *See id.* at 2614:15-18.

[14]    8/18/09 Tr. at 1893:23-1894:15.

[15]    *Id.* at 1896:12-21 ("Well, I got a schedule of how wells [are] planned
to be pumped, from consultants that are water planners for the City of New York.
So they gave me what was the proposed pumping scenario for all these wells in the
Queens area. . . . We really can't look at Station 6 by itself because there are other
wells near Station 6, and when those wells pump they affect the water flow
direction at the wells near Station 6 also.  So rather than looking at just how

shape of the Station 6 capture zone depends heavily on the assumed pumping scenario.[16]

Terry then described a transport model he had created to show "how [MTBE will] move through the groundwater system."[17] The transport model, which "rides on top of the flow model,"[18] is used to make "numerical predictions" regarding the amount of MTBE that will enter the Station 6 wells.[19] As with the flow model, the transport model relies on specific assumptions – *e.g.*, the locations of MTBE discharges and the levels of those discharges – that can greatly affect the model's results.[20]

Terry ran two different transport models based on varying assumptions. He ran an "Analysis 1" model – which used recorded MTBE concentrations from groundwater samples taken in 2004 – to determine the peak

---

Station 6 will operate, you also have to look at how the other wells will operate."); 8/19/09 Tr. at 1984:5-7 ("[A]s the Station 6 wells continue to pump into time, water will be drawn from further and further away from the Station 6 wells.").

[16]    *See id.* at 1902-1912.

[17]    *Id.* at 1894:17-23.

[18]    *Id.* at 1894:18.

[19]    8/19/09 Tr. at 2012:24-2013:5.

[20]    *See id.* at 2013:24-2014:6.

concentration of MTBE in the Station 6 wells and the date of that peak concentration.[21]  On the basis of this analysis, he predicted that the maximum MTBE concentration in the combined outflow of the Station 6 wells would be thirty-five ppb in 2024.[22]

Terry also ran an "Analysis 2" model using the same transport and flow models but with different assumptions about the amount of MTBE present in the groundwater.  As Terry explained, the purpose of Analysis 2 was to see how long MTBE contamination will last at Station 6.[23]  To do so, Terry input three separate scenarios which assumed that the amount of MTBE gasoline spilled at each of twenty-two known release sites was on average fifty gallons, five hundred gallons or two thousand gallons.[24]  The peak concentration values predicted by Analysis 2 ranged from non-detect (fifty gallons per release) to six ppb (five hundred gallons per release) to seventeen to twenty-three ppb (two thousand

---

[21]     See id. at 2015:6-8.

[22]     See id. at 2067:17-19; 8/18/09 Tr. at 1895:7-11.

[23]     See 8/19/09 Tr. at 2015:9-15 ("Then I did a second analysis I called Analysis 2, and that used sort of a different approach, a more average approach and that was looking to see how long will it last.  My first analysis also gives me information about that, but I kind of wanted to test, because I had uncertain information, I wanted to test and see whether Station 6, how long the MTBE concentration will be present there in the future.").

[24]     See id. at 2074:6-2075:2.

gallons per release).[25]  Terry concluded that both the two thousand gallon and five hundred gallon scenarios would result in an "impact to Station 6."[26]

   After deliberating for two days at the close of Phase II, the jury informed the Court that it was unable to come to a unanimous decision on the second question – the level and timing of MTBE's peak concentration.[27]  Because the jury was instructed that it should only reach the second question if it answered the first question affirmatively, I inquired as to whether the jury had reached a verdict on the first question.  The jury informed me that it had reached a unanimous verdict on that question[28] and that it had found that MTBE would be present in the Station 6 capture zone when the City began to operate those wells.[29]  After taking the jury's partial verdict, I then gave the jury an *Allen* charge on the second question.[30]  In summing up that charge, the jury was instructed:

> Do not hesitate to reexamine your own views and to change your opinion if you are convinced you were wrong, but do not

---

[25] *See* Pl. Ex. 1682.

[26] 8/19/09 Tr. at 2085:3-9.

[27] *See* 8/26/09 Tr. at 2675:2-15.

[28] *See id.* at 2682:5-10.

[29] *See id.* at 2682:15-2683:4.

[30] *See id.* at 2683:5-2686:21.

surrender your honest belief as to the weight and effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.[31]

Shortly afterward, the jury submitted another note to the Court – querying, *inter alia*, whether the second question could be restructured or rephrased.[32]  In response, I instructed the jury that it did not need to select one of the concentration ranges provided by the Court and that it could choose any concentration level that it was able to agree upon unanimously.[33]  After further deliberation, the jury reached a verdict.  It did not settle on any of the suggested ranges – finding instead that the concentration of MTBE in the combined outflow of the Station 6 wells will peak at ten ppb in 2033.[34]

### C.   Phase III

In Phase III, the jury answered specific interrogatories relating to: (1) whether the City is, or will be, injured by the MTBE that will be in the combined outflow of the Station 6 wells when the City begins to use them as a backup source of water; (2) whether ExxonMobil was a cause of that injury (if it exists) as either

---

[31]    *Id.* at 2686:4-8.

[32]    *See id.* at 2688:2-7.

[33]    *See id.* at 2698:3-11.

[34]    *See id.* at 2711:4-22.

-10-

a direct spiller of MTBE gasoline or as a manufacturer, refiner, supplier or seller

of MTBE gasoline; (3) whether ExxonMobil was liable under the various state law

causes of action asserted by the City; and (4) if ExxonMobil was liable, the

amount of compensatory damages that should be awarded to the City.

### 1. Injury

In Phase III, the jury determined that the City had "proven, by a fair

preponderance of the credible evidence, that it is, or will be, injured by the MTBE

that will be in the combined outflow of the Station 6 wells."[35]   In making this

determination, the jury was instructed that "the question is whether the [C]ity has

proven by a fair preponderance of the credible evidence that a reasonable water

provider in the [C]ity's position would treat the water to reduce the levels or

minimize the effects of the MTBE in the combined outflow of the Station 6 wells

in order to use the water as a back-up source of drinking water."[36]  I also informed

the jury that I had previously ruled that the concentration of MTBE need not

exceed New York's MCL to constitute an injury,[37] but that it was up to the jury "to

determine whether the level of MTBE [it] ha[d] found will be in the Station 6

---

[35]   10/19/09 Tr. at 7042:10-13.

[36]   10/7/09 Tr. at 6604:5-10.

[37]   See id. at 6604:16-22.

-11-

wells in the future will constitute an injury to the [C]ity."[38]

## 2.    Causation

The City asserted three separate theories of causation at trial – direct spiller causation, manufacturer/refiner/supplier/seller causation, and a commingled product theory of causation.  As I explain in more detail below,[39] the commingled product theory of causation has been developed during the course of this MDL as an alternative to traditional theories of toxic tort causation.[40]  The jury found that the City proved, by a fair preponderance of the credible evidence that ExxonMobil was a cause of the City's injuries both as a direct spiller of gasoline containing MTBE and as a manufacturer, refiner, supplier or seller of gasoline containing MTBE.[41]  Because the jury found that the City met its burden under these traditional theories of causation, it did not determine whether the City met its burden under the commingled product theory of causation.[42]

### a.    Direct Spiller Causation

---

[38]    *Id.* at 6604:22-24.

[39]    *See infra* Part IV.C.

[40]    *See, e.g., In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 377-79 (S.D.N.Y. 2005).

[41]    *See* 10/19/09 Tr. at 7042:22-7043:4.

[42]    *See id.* at 7043:6-7.

The jury was instructed that ExxonMobil was the owner or controller

of underground storage tank ("UST") systems located in specific stations in

Queens County, New York and that ExxonMobil was liable as direct spiller if it

found : (a) that "[a]t any time that [ExxonMobil] owned or controlled some or all

of these underground storage systems, they leaked gasoline containing MTBE";

and (b) "[t]hat these leaks caused or will cause an injury to the [C]ity's Station 6

wells."[43] The jury was also instructed that "[a]n act or omission is regarded as a

cause of an injury if it is a substantial factor in bringing about the injury; that is, if

it has such an effect in producing the injury that reasonable people would regard it

as a cause of the injury."[44]

### b. Manufacturer/Refiner/Supplier/Seller Causation

The jury was instructed that ExxonMobil was a cause of the City's

injury *in its capacity* as a manufacturer, refiner, supplier or seller if its "conduct in

[these capacities] was a substantial factor in causing the [C]ity's injuries."[45] As

before, a substantial factor was defined as having "such an effect in producing the

[43]    10/7/09 Tr. at 6605:10-15.

[44]    *Id.* at 6605:19-22.

[45]    *Id.* at 6606:6-11 (emphasis added).

-13-

injury that reasonable people would regard it as a cause of the injury."[46]  In making

this decision, the jury was told that it "should consider how much, if any, of the

gasoline containing MTBE that was delivered to the locations that are the sources

of the MTBE that injured or will injure the Station 6 wells came from gasoline

containing MTBE that was manufactured, refined, supplied, or sold by

[ExxonMobil]."[47]

### 3.    State Law Causes of Action

Relying on its injury and causation findings, the jury found

ExxonMobil liable under the City's public nuisance,[48] trespass,[49] direct spiller

negligence[50] and failure to warn (product liability)[51] claims.  However, it found

that ExxonMobil was not liable under the City's defective design (product

liability)[52] and private nuisance[53] claims.  With respect to the City' design defect

---

[46]     *Id.* at 6606:23-24.

[47]     *Id.* at 6606:12-17.

[48]     *See* 10/19/09 Tr. at 7044:17-20.

[49]     *See id.* at 7044:9-11

[50]     *See id.* at 7044:23-7045:1.

[51]     *See id.* at 7043:22-7044:6.

[52]     *See id.* at 7043:9-21.

[53]     *See id.* at 7044:13-15.

-14-

claim, the jury was instructed that the City must prove three elements by a fair preponderance of the credible evidence: (1) that "gasoline containing MTBE was not reasonably safe for its intended or reasonably foreseeable purpose or in light of the reasonably foreseeable harms caused by its use;"[54] (2) that "there was a safer feasible alternative design at the time it was marketed;"[55] and (3) that "the defective design was a substantial factor in causing the City's injury."[56]  Although the jury determined that the design was not reasonably safe,[57] it found that there was no safer, feasible alternative design to MTBE.[58]  Accordingly, it did not reach the causation question.[59]  The jury was not asked to answer specific interrogatories relating to the City's private nuisance claim.

### 4.   Affirmative Defense:  Statute of Limitations

The jury also considered one affirmative defense – whether the City had brought its claims in a timely manner – asserted by ExxonMobil.  To succeed

---

[54]   10/7/09 Tr. at 6610:7-9.

[55]   *Id.* at 6610:10-11.

[56]   *Id.* at 6610:12-13.

[57]   *See* 10/19/09 Tr. at 7043:9-14.

[58]   *See id.* at 7043:15-19.

[59]   *See id.* at 7043:20-21.

on this defense, ExxonMobil was required to show by a fair preponderance of the credible evidence that, prior to October 31, 2000, (1) "there was a sufficient level of MTBE in the capture zone of the Station 6 wells such that if the wells were turned on, the level of MTBE in the combined outflow of the Station 6 wells would have injured the City at that time,"[60] and (2) "the [C]ity knew at the time or reasonably should have known that there was a sufficient level of MTBE in the capture zone of the Station 6 wells prior to October 31, 2000 to cause an injury."[61] The jury was again instructed that the "[C]ity's water was not injured, or otherwise harmed, merely because it has been contaminated by a small amount of MTBE,"[62] but that "ExxonMobil need not necessarily prove that the [C]ity's water was contaminated at that time by a concentration of MTBE that exceeded the maximum contaminant levels set by regulatory authorities."[63] The jury determined that ExxonMobil had failed to prove that the City brought its claims in an untimely manner.[64]

---

[60]   10/7/09 Tr. at 6631:19-22.

[61]   *Id.* at 6631:23-6632:2.

[62]   *Id.* at 6632:31-23.

[63]   *Id.* at 6633:1-3.

[64]   *See* 10/19/09 Tr. at 7045:3-6.

### 5.    Damages

The jury was instructed that if it found ExxonMobil liable under any

of the City's causes of action, it was required to award the City compensatory

damages sufficient to compensate the City for losses caused by ExxonMobil.[65]

The jury made its damages determination in four stages.  *First*, it was asked what

sum of money will compensate the City for the actual losses it has sustained, or

will sustain in the future, as a result of contamination at Station 6.[66]  In making this

determination, the jury was given the following guidance:

> Generally, the measure of damages to property is based upon the
> value of the property at the time of the injury.  When, as in this
> case, the property damaged has no reasonable market value,
> plaintiff may recover the difference in money between the value
> to plaintiff of the property before and after the damage.  In
> determining the amount of such loss, you must consider the
> evidence presented with respect to its utility, its general condition
> at the time of its damages, whether it may be treated, and, if so,
> the expense of treating it, the likelihood that it will be treated if
> the money is available to do so, and its value as so treated as
> compared to the value before its damage, together with all other
> evidence presented to establish its value to the City and the extent
> of the City's damage.[67]

The jury found that the City will be fairly and reasonably compensated by an

---

[65]    *See* 10/7/09 Tr. at 6634:20-22.

[66]    *See id.* at 6635:8-13.

[67]    *Id.* at 6635:10-6636:8.

award of $250,500,000.  In doing so, the jury evidently adopted the opinion of

Marnie Bell, the City's damages expert – who testified that, assuming

contamination at ten ppb, it will cost the City $250,450,000 to remove MTBE

from the Station 6 wells.[68]  This estimate was based on three components: (1)

$59,990,000 in initial capital to construct the Station 6 treatment plant; (2)

$48,870,000 in equipment replacement costs; and (3) $141,590,000 in operation

and maintenance costs.[69]  The operation and maintenance costs were based on the

"worst case scenario" that the Station 6 wells will have to be operated

continuously for forty years (which is the approximate amount of time that MTBE

contamination at the Station 6 wells is predicted to endure).[70]

        *Second*, ExxonMobil contended at trial that the groundwater in the

Station 6 capture zone is polluted by other contaminants and that these other

contaminants will require the City to treat the Station 6 wells regardless of

whether there is MTBE contamination.[71]  Accordingly the jury was instructed:

---

[68]     *See* City's Demonstrative Slides for Marnie Bell ("Bell's
Demonstrative Slides"), Ex. G to Declaration of Lauren Handel, counsel for
ExxonMobil, at 1; 9/24/09 Tr. 5996:5-10.

[69]     *See* Bell's Demonstrative Slides at 1.

[70]     9/30/09 Tr. at 6018:13-6019:2. *Accord* Bell's Demonstrative Slides
at 1; 9/24/09 Tr. at 5885:6-23.

[71]     *See* 10/7/09 Tr. at 6636:21-6637:5.

> If you find that ExxonMobil has shown, by a fair preponderance of the credible evidence, that the costs of treating the other contaminants in isolation can be fairly estimated, then you must reduce the City's damage award for treating MTBE by the cost of treating these other contaminants in isolation.[72]

The jury found that the City's award should be reduced by seventy million dollars due to the pre-existing contamination.

*Third*, the jury was asked whether other companies (defendants that were voluntarily dismissed pursuant to settlement agreements) were also at fault in producing the City's injury.[73]  The jury was given a list of these companies and was required to "decide the percentage of the total fault borne by these other companies as compared to ExxonMobil's fault."[74]  In total, the jury found that forty-two percent of the fault for the City's injury should be apportioned to these other companies.

*Fourth*, and finally, the jury was asked to determine whether the City was negligent as a spiller of MTBE gasoline and, if so, whether the City's negligent conduct was a substantial factor in causing its own injury.[75]  The jury

---

[72]   *Id.* at 6637:10-15.

[73]   *See id.* at 6637:20-6638:1.

[74]   *Id.* at 6638:1-4.

[75]   *See id.* at 6638:17-6639:16.

-19-

found that the City had no responsibility for causing its own injury.

In sum, the jury determined that the City's actual damages, taking into account the amount the City will have to pay to remediate pre-existing contamination in the groundwater, are $180,500,000 and that ExxonMobil was responsible for fifty-eight percent of those damages. Pursuant to these findings, ExxonMobil is liable to the City in the amount of $104,690,000.

### 6.    Juror Misconduct

Two issues of juror misconduct arose during the jury's Phase III deliberations. The first was the revelation that one juror had conducted Internet research during the Phase III deliberations. He was subsequently excused from the jury. The second was an apparent instance of uncivil behavior during the Phase III deliberations – which again resulted in the dismissal of a juror.

### a.    Internet Research

On October 9, 2009, shortly after the jury was charged in Phase III, I received a note from the jury foreperson that one of the jurors had conducted research about the case on the Internet. That note stated: "Juror No. 8 . . . has admitted to researching on the Internet. He proclaimed that the information he found strengthened his opinion. We feel that he will be biased in our deliberations. This information was brought to our attention on Wednesday,

October 7th, and we are concerned."[76]

Shortly after receiving the note, and conferring with counsel, I conducted a voir dire of Juror No. 8. He informed the Court that his children had performed Internet research relating to this case and shown him the results.[77] Specifically, Juror No. 8 admitted to viewing reports relating to the jury's verdicts in Phase I and Phase II,[78] a prior opinion of this Court describing the commingled product theory of causation,[79] and some information about one of the City's lawyers, Victor Sher. When I conducted a second voir dire of Juror No. 8, he opined that the other jurors did not want him on the jury anymore because he was "usually the last hold out on all the questions."[80] However, he made clear that he was not indicating the substance of the jury's deliberations, and I informed him that he should not do so.[81]

Although Juror No. 8 initially stated that "everybody" had performed

---

[76]    10/9/09 Tr. at 6753:15-20.

[77]    See id. at 6762:9-14.

[78]    See id. at 6762:19-6763:6.

[79]    See id. at 6764:3-6765:15.

[80]    Id. at 6835:18-25.

[81]    See id. 6836:5-7.

Internet research and that some jurors had driven to Station 6,[82] after being pressed
by the Court on this claim, he clarified that he did not know of any jurors who had
performed Internet research and that he only knew of one juror who had tried to
travel to Station 6 (but had not found it).[83]  Nevertheless, to determine what
information the jury had been exposed to, I conducted a voir dire of the remaining
jurors.[84]  Each juror was asked individually if he or she had performed any outside
research or learned any information from another juror who had performed outside
research.[85]

        In the course of this investigation, several of the jurors admitted that
they had been exposed to some limited outside information relating to the case.
*First*, Juror No. 4 indicated that he had tried to drive over to Station 6 but that he
could not find it.[86]  *Second*, Juror No. 5 stated that Juror No. 8 informed him that
he had found out "that Exxon was the last oil company to kind of hold out and

---

[82]    *See id.* at 6761:14-15.

[83]    *See id.* at 6766:4-22, 6827:22-6828:1.

[84]    *See id.* at 6775:17-6824:9

[85]    *See, e.g., id.* at 6776:7-8, 6777:7-10.

[86]    *See id.* at 6776:9-20.

wasn't settling out of court"[87] and that the City had received about one million

dollars from each company.[88]  Juror No. 5 asserted that he had not performed any

outside research himself.[89]  *Third*, Juror No. 6 conducted some research about me

on Wikipedia and read an article in the New York Times about water

contamination caused by the coal industry.[90]  She also stated that Juror No. 8 had

told her that plaintiffs in other cases had received money, but that "he didn't really

say the details of the rulings."[91] *Fourth*, and finally, Juror No. 11 stated that Juror

No. 8 had informed him that the trial was going to have a fourth phase[92] and that

Juror No. 8 had learned that by conducting Internet research.[93]

After conducting this investigation, I excused Juror No. 8 from the

jury.  However, because I did not believe that the rest of the jury had been

---

[87]     *Id.* at 6814:11-12.

[88]     *See id.* at 6814:22-6815:1.

[89]     *See id.* at 6813:11-17.

[90]     *See id.* at 6795:11-12, 6796:9-14.

[91]     *Id.* at 6798:16-21.

[92]     *See id.* at 6808:4-6 ("Oh, actually, he was saying something to the effect about the Phase IV and something about some other penalty part that is just going to be Phase IV.").

[93]     *See id.* at 6809:4-6.

prejudiced by its exposure to extra-record information, I did not excuse any of the other jurors and denied ExxonMobil's motion for a mistrial.

### b.    Uncivil Behavior

On the evening of October 15, 2009, I received a phone call from Juror No. 2 – who, clearly shaken by the experience, informed the Court that Juror No. 1 had insulted her and threatened to "cut" her during deliberations.[94]  In response to that allegation, on October 16, 2009, I questioned every juror individually about the alleged incident and the general level of civility in the jury room.  While a few jurors noted that discussions among jurors had become heated,[95] no other juror claimed that he or she felt threatened or was unable to continue deliberating.[96]  When Juror No. 2 was questioned individually, however, she continued to assert that she felt threatened and felt as though she could not freely make her own decisions.[97]

Because Juror No. 2 continued to assert that she felt threatened, I

---

[94]      10/16/09 Tr. at 6994:5-13.

[95]      *See, e.g., id.* at 7003:14-15 (Juror No. 9) ("Yeah, no, it's fine. It just gets a little animated every once in a while.").  I note that the trial lasted for eleven weeks and the Phase III deliberations continued for nine days.

[96]      *See id.* at 7000:4-7012:20

[97]      *See id.* at 7010:16-7011:2.

-24-

subsequently excused her from the jury. I did not, however, find it necessary to excuse any of the other jurors. As I stated to counsel:

> So, as you hear, by voir diring each juror one by one, I am confident that every juror, other than Juror No. 2, feels he or she has not been threatened, that it is just a natural part of deliberations, that people discuss things and do so in a vigorous way. But I am absolutely confident nobody feels threatened other than Juror No. 2, and she says she no longer feels she can reach her own verdict. So it strikes me that she ought to be excused . . . .[98]

Both ExxonMobil and the City agreed that Juror No. 2 should be excused.[99]

In addition, ExxonMobil moved that Juror No. 1 "be excused for threatening a juror with physical violence,"[100] and requested that I question Juror No. 2 again to determine whether she had actually been threatened with physical violence.[101] Although I doubted that Juror No. 1 should be dismissed, I acceded to ExxonMobil's request in order to create a record for appeal. When questioned for a second time, Juror No. 2 asserted again that she had been mistreated: "I was called names yesterday. I was called – at the end of the day, they said I was stupid, I can't form my own opinion because it doesn't match the rest of them.

---

98     *Id.* at 7012:23-7013:5.

99     *See id.* at 7013:24-25; 7016:1-3.

100    *Id.* at 7014:3-4.

101    *See id.* at 7014:15-19.

-25-

And I feel – I feel that I am not safe."[102]  When prodded to explain further why she

felt unsafe, she explained that Juror No. 1 had "threatened to . . . cut [her] and . . .

threatened [her] with a fork."[103]

ExxonMobil subsequently moved for a mistrial "based on the further

developing . . . fact [that] . . . an actual instrument was used in the jury room . . .

."[104]  I denied ExxonMobil's motion – noting that none of the other jurors had

expressed discomfort or indicated that Juror No. 1 had brandished a fork in a

threatening manner.[105]  Given these facts, I deemed it permissible for the jury to

continue deliberating – albeit after I instructed them on the importance of civility

and asked them to refrain from "shouting," "cursing" or engaging in any

"threatening behavior."[106]

---

[102]     *Id.* at 7017:8-12.

[103]     *Id.* at 7017:17-23.

[104]     *Id.* at 7022:15-17.

[105]     *See id.* at 7022:18-24.  Although I do not believe Juror No. 2
fabricated this story, oftentimes two people may interpret an identical situation in
wholly divergent ways.  Accordingly, although it is impossible to know the truth
in a he-said/she-said situation, there was little indication that Juror No. 1's actions
(while most likely overly aggressive) warranted dismissal from the jury.  Most
importantly, all of the remaining jurors affirmed that they in no way felt threatened
or unable to freely deliberate.

[106]     *Id.* at 7021:5-7022:10.

## III. LEGAL STANDARD

### A. Motion for Judgment as a Matter of Law Under Rule 50 and Motion for a New Trial Under Rule 59

A court may render judgment as a matter of law when "a party has

been fully heard on an issue during a jury trial and the court finds that a reasonable

jury would not have a legally sufficient evidentiary basis to find for the party on

that issue."[107] The standard for granting judgment as a matter of law "mirrors" the

standard for granting summary judgment.[108] Accordingly, in ruling on such a

motion, the trial court is required to

> consider the evidence in the light most favorable to the party
> against whom the motion was made and to give that party the
> benefit of all reasonable inferences that the jury might have drawn
> in his favor from the evidence. The court cannot assess the
> weight of conflicting evidence, pass on the credibility of the
> witnesses, or substitute its judgment for that of the jury.[109]

A jury verdict cannot be set aside lightly. A court may not grant judgment as a

matter of law unless (1) there is such a "complete absence of evidence supporting

---

[107]    Fed. R. Civ. P. 50(a)(1).

[108]    *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150
(2000) (quotation marks and citations omitted); *Kerman v. City of New York*, 374
F.3d 93, 118 (2d Cir. 2004).

[109]    *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quotation
marks and citation omitted).

the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" or (2) there is "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]."[110]

A "court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."[111]   The legal test for granting a new trial is less stringent than for granting judgment as a matter of law. "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict."[112]   Nevertheless, in practice courts do not grant new trials as freely as the language suggests. "'A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict

---

[110]   *United States v. Space Hunters, Inc.*, 429 F.3d 416, 429 (2d Cir. 2005) (quotation marks and citation omitted). *Accord Doctor's Assocs. v. Weible*, 92 F.3d 108, 111-12 (2d Cir. 1996).

[111]   Fed. R. Civ. P. 59(a)(1)(A).

[112]   *See Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000) (quotation marks and citation omitted).

is a miscarriage of justice.'"[113]

Under Federal Rule of Civil Procedure 50(b), "[n]o later than 28 days after the entry of judgment . . . the movant may file a renewed judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct entry of judgment as a matter of law."

## B.     Motion for a New Trial on Damages or Remittur

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount."[114]  A district court must apply New York law to evaluate whether awards in cases decided under New York law are excessive.[115]  Pursuant to Section 5501(c) of the New York Civil Practice Law and Rules ("CPLR"), a

---

[113]     *Tesser v. Board of Educ.*, 370 F.3d 314, 320 (2d Cir. 2004) (quoting *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 623-24 (2d Cir. 2001)).

[114]     *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995) (citations omitted).

[115]     *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 437 (1996); *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 137 (2d Cir. 2008).

court should reduce an award when it "deviates materially" from "reasonable compensation."[116] "[The New York] standard is less deferential to the jury and thus more favorable to the party challenging the award than is the federal 'shocks the conscience' [standard]."[117]

## IV.   SUBSTANTIVE LAW

### A.   Federal Preemption

The doctrine of federal preemption is rooted in the Supremacy Clause of the United States Constitution, which provides that federal law made pursuant to authority granted by the Constitution "shall be the supreme Law of the Land."[118] "[This Court's] inquiry into the scope of a statute's pre-emptive effect is guided by the rule that '[t]he purpose of Congress is the ultimate touchstone' in every

---

[116]   N.Y. C.P.L.R. § 5501(c).  *See Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (holding that although Section 5501 directs the appellate division to review whether a jury's award is excessive, under federal law, which controls the role of trial and appellate courts in the federal system, "primary responsibility for application of § 5501(c)'s deviates materially check is lodge[d] in the district court, not the court of appeals" (quotation marks and citations omitted)).

[117]   *Gasperini v. Center for Humanities, Inc.*, 149 F.3d 137, 140 (2d Cir. 1988).

[118]   U.S. Const. art. VI, cl. 2.

pre-emption case.'"[119]  "The Supreme Court has identified three situations that

show congressional intent to preempt state law: (1) where Congress expressly

states its intent to preempt [express preemption]; (2) where Congress's scheme of

federal regulation is sufficiently comprehensive to give rise to a reasonable

inference that it leaves no room for the state to act [field preemption]; and (3)

where state law actually conflicts with federal law [conflict preemption]."[120]

       Conflict preemption, which is at issue in this case, occurs "where it is

*impossible* for a private party to comply with both state and federal requirements,

or where state law stands as an obstacle to the accomplishment and execution of

the full purposes and objectives of Congress."[121]  "Absent clear congressional

intent to the contrary, federal preemption of state law is not favored, especially in

areas of law traditionally occupied by the states."[122]  Impossibility requires

---

[119]    *Altria Group, Inc. v. Good,* — U.S. —, 129 S.Ct. 538, 543 (2008) (quoting *Medtronic, Inc. v. Lohr,* 528 U.S. 470, 486 (1996)).

[120]    *Marsh v. Rosenbloom,* 499 F.3d 165, 177 (2d Cir. 2007) (citing *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 280 (1987)).

[121]    *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287 (1995) (emphasis added).

[122]    *Marsh,* 499 F.3d at 177-78.

"physical impossibility"[123] – *e.g.*, if federal law says do X, and a state law says *do*

*not* do X. Although the "obstacle preemption" prong is arguably broader than the

"physical impossibility" prong, it is by no means easy to satisfy. It requires clear

evidence of congressional intent and "a sharp conflict between state law and

federal policy."[124]

## B.   Statute of Limitations

"The statute of limitations is normally an affirmative defense on

which the defendant has the burden of proof."[125]  The common law property tort

claims for which the City seeks damages are governed by the three year limitations

period of section 214(4) of the CPLR. This provision, however, is altered by the

discovery rule of section 214-c(2), which modifies the date on which the three

year limitation period begins to run:

> Notwithstanding the provisions of section 214, the three year
> period within which an action to recover damages for . . . injury
> to property caused by the latent effects of exposure to any
> substance or combination of substances, in any form, upon or
> within . . . property must be commenced shall be computed from

---

[123]   *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963).

[124]   *Marsh*, 499 F.3d at 179.

[125]   *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004) (citation omitted) (applying New York law).

-32-

> the date of discovery of the injury by the plaintiff or from the date
> when through the exercise of reasonable diligence such injury
> should have been discovered by the plaintiff, whichever is earlier.

In interpreting New York's discovery rule in prior rulings, I have explained that

the City's state law claims "accrue when it first knows of both (1) the presence of

MTBE at a level sufficient to constitute an injury and (2) the harmful impact of

MTBE on drinking water."[126]

## C. Causation

As a general rule, the plaintiff in a tort action must prove by a

preponderance of the evidence that the defendant's conduct was the factual and

proximate (or legal) cause of its injury. This principle has raised an astonishing

number of issues in this MDL, and I have spent a great deal of time and effort

determining the applicability of both traditional and alternative theories of

causation. Although the jury in this case was only charged on New York's

traditional rules of causation and the commingled product theory of causation, I

also describe the concurrent wrongdoing theory of liability and the market share

theory of liability as they are important to understanding the arguments asserted in

these post-trial motions.

---

[126]    *In re MTBE Prods. Liab. Litig.*, No. 00 Civ. 1898, 2007 WL 1601491,
at *7 (S.D.N.Y. June 4, 2007). *Accord In re MTBE*, 2009 WL 2634749, at *2.

## 1.    Traditional Causation

### a.    Factual and Proximate Cause

As stated, tort liability usually depends upon proof that a defendant's conduct was the legal cause of a plaintiff's injury.[127]  The substantial factor standard for causation, adopted in New York, requires that the plaintiff prove by a preponderance of the evidence that the defendant's conduct was *a substantial factor* in producing plaintiff's injury.[128]  The Second Restatement of Torts outlines three considerations that are important in determining whether defendant's conduct was a substantial factor in bringing about a harm: (1) "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;" (2) "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;" and (3) the "lapse of time" between the

---

[127]    *See* Restatement (Second) of Torts § 430.

[128]    *See Mortensen v. Memorial Hospital*, 483 N.Y.S.2d 264, 269 (1st Dep't 1984) ("To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury."). In strict products liability, it is the product defect or the failure to warn, rather than the defendant's conduct, that must be shown to be a substantial cause of the plaintiff's injuries. *See Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106 (1983).

conduct and the injury.[129]

### b.     Identification of Injurious Product

In addition, and of relevance to this case, New York generally requires "identification of the exact defendant whose product injured the plaintiff."[130]  "The identity of the manufacturer of a defective product may be established by circumstantial evidence."[131]  However, such evidence cannot be "speculative or conjectural."[132]  "The circumstantial evidence . . . must establish that it is reasonably probable, not merely possible or evenly balanced, that the defendant was the source of the offending product."[133]

### 2.     Alternative Theories of Liability

In limited circumstances, courts permit alternative theories of liability where traditional principles of causation do not establish liability in order to protect the interests of plaintiffs and properly apportion liability among defendants. *First*, under the concurrent wrongdoing theory of liability, "[w]hen

---

[129]     Restatement (Second) of Torts § 433.

[130]     *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 504 (1989).

[131]     *Healey v. Firestone Tire & Rubber Co.,* 87 N.Y.2d 596, 601 (1996).

[132]     *Id.* at 602.

[133]     *Id.* at 601-02.

two or more tortfeasors act concurrently or in concert to produce a single injury,

they may be held jointly and severally liable."[134]  Significantly, in concurrent

wrongdoing cases, plaintiffs need not prove that each defendant's conduct, taken

alone, would have injured the plaintiff.[135]  Instead, "each tortfeasor is responsible

for the entire result, even though [its] act alone might not have caused it."[136]

   *Second*, New York has on occasion permitted plaintiffs to proceed on

a market share theory of liability.  This theory of liability was first adopted by the

New York Court of Appeals in *Hymowitz v. Eli Lilly & Co.* to determine liability

and apportion damages in diethylstilbestrol ("DES") cases.[137]  DES is a synthetic

substance taken by women during pregnancy for the purpose of preventing

miscarriages.[138]  It was banned in 1971 by the Federal Drug Administration when

studies established a link between women who took the drug and harmful latent

---

[134]   *Ravo v. Rogatnick,* 70 N.Y.2d 305, 311-12 (1987) (upholding the application of joint and several liability where "the evidence established that plaintiff's brain damage was a single indivisible injury, and defendant failed to submit any evidence upon which the jury could base an apportionment of damage").

[135]   *See In re MTBE Prods. Liab. Litig.*, 644 F. Supp. 2d 310, 313 (S.D.N.Y. 2009).

[136]   *Hill v. Edmonds*, N.Y.S.2d 1020, 1021 (2d Dep't 1966).

[137]   *See Hymowitz*, 73 N.Y.2d at 502.

[138]   *See id.*

-36-

effects in their offspring.[139]  For various reasons, including the long latency period

of DES injuries, women who used DES generally did not know which company

had manufactured the DES pills they ingested.  To protect the interest of those

injured by DES, the Court of Appeals determined that liability may be apportioned

according to defendants' national market share in cases in which identification of

the manufacturer of the drug that injured the plaintiff is impossible.[140]  Thus, the

market-share theory "provides an exception to the general rule that a plaintiff must

prove that the defendant's conduct was a cause-in-fact of the injury."[141]  A

defendant may be held partially liable under the market-share theory without any

showing that the defendant caused, or contributed to, the injury.[142]

        *Third*, in order to protect the interests of plaintiffs in this MDL while

fairly apportioning liability, I have developed the commingled product theory of

liability.  "[U]nder the 'commingled product theory' of market share liability,

when a plaintiff can prove that certain gaseous or liquid products (*e.g.*, gasoline,

---

        [139]    *See id.* at 502-03.

        [140]    *See id.* at 509-13.

        [141]    *In re MTBE Prods. Liab. Litig.*, 447 F. Supp. 2d 289, 299 (S.D.N.Y. 2006).

        [142]    Indeed, the New York Court of Appeals held that "there should be no exculpation of a defendant who, although a member of the market . . . , appears not to have caused a particular plaintiff's injury."  *Hymowitz*, 73 N.Y.2d at 512.

-37-

liquid propane, alcohol) of many refiners and manufacturers were present in a completely commingled or blended state at the time and place that the harm or risk of harm occurred, and the commingled product caused plaintiff's injury, each refiner or manufacturer is deemed to have caused the harm."[143]   Each defendant is then given the opportunity to exculpate itself by proving that "its product was not present at the relevant time or in the relevant place, and therefore could not be part of the commingled or blended product."[144]

This hybrid theory has similarities to both market share liability and concurrent wrongdoing liability.  Like market share liability, damages are apportioned according to each defendant's share of the market at the time of injury, and thus, liability is several, rather than joint and several.[145]  Unlike market share liability, however, a plaintiff must prove by a preponderance of the evidence that the defendant contributed-in-fact to the injury by showing that each defendant's product was part of the commingled mass that injured the plaintiff.[146] In this respect, commingled product liability is similar to concurrent wrongdoing

---

[143]    *In re MTBE*, 447 F. Supp. 2d at 301.

[144]    *Id.*

[145]    *See In re MTBE*, 643 F. Supp. 2d at 468-69.

[146]    *See In re MTBE*, 644 F. Supp. 2d at 318.

liability. It requires the plaintiff to prove that each defendant's gasoline was part

of the commingled product, but relieves the plaintiff of the duty to prove that each

individual defendant's contribution to that product, *taken by itself*, was sufficient

to have caused an injury.[147] "Rather, to establish liability against a particular

defendant with respect to an individual well, [the plaintiff] must show that (a) the

defendant's MTBE was present in a commingled product and (b) 'the *commingled*

*product* [rather than defendant's product *alone*] caused plaintiff's injury.'"[148]

## V.   DISCUSSION

ExxonMobil has made a plethora of arguments in its post-trial

motions. These can be summarized as follows: (1) it proved its affirmative

defenses at trial; (2) the City failed to prove two essential elements of its state law

causes of action – injury and causation; (3) several of the City's causes of action

should be dismissed as a matter of law; (4) the Court made erroneous evidentiary

rulings; (5) a certain juror should have been excused; (6) a mistrial should have

been granted  because a juror impermissibly conducted research on the Internet;

and (7) the jury's damages award is excessive.

---

[147]    *See id.* at 319.

[148]    *Id.* (quoting *In re MTBE*, 447 F. Supp. 2d at 301) (emphasis in
original).

## A.    Affirmative Defense: Federal Preemption

In 1990, Congress enacted amendments to the Clean Air Act ("CAA") that, *inter alia*, created the Reformulated Gasoline Program ("RFG Program").[149]  The RFG Program required gasoline used in specific geographic areas to have a minimum oxygen content – achieved by the addition of oxygenates such as MTBE and ethanol.[150]  After the passage of the CAA amendments, the Environmental Protection Agency ("EPA") certified various blends of gasoline for use in the RFG Program, including gasoline containing MTBE, but did not mandate the use of any one oxygenate.[151]  Congress repealed the oxygenate requirement in 2005.[152]

ExxonMobil previously sought summary judgment on the ground that the City's state tort claims – by imposing a duty not to use MTBE – are preempted by the CAA amendments.[153]  Although I rejected that motion, ExxonMobil argues

---

[149]    *See* 42 U.S.C. § 7545.

[150]    *See id.* §§ 7545(k)(2)(b) & (m)(2).

[151]    *See id.* § 7545(k)(1)(A).

[152]    *See* Energy Policy Act of 2005, Pub. L. No. 109-58, § 1504(a), 119 Stat. 594 (codified in various sections of 16 U.S.C. and 42 U.S.C.) (2005).

[153]    *See generally In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 324 (S.D.N.Y. 2006) (citations omitted).  ExxonMobil's motion was part of a single summary judgment motion filed by the MDL defendants on federal preemption

-40-

that the jury's determination (in the context of the City's design defect claim) that there was no safer, feasible alternative to MTBE shows that ExxonMobil proved its affirmative defense of conflict preemption at trial.  ExxonMobil urges this theory under both prongs of the conflict preemption test – physical impossibility and obstacle preemption.

### 1.  **Physical Impossibility**

Because the RFG Program did not expressly require the use of MTBE over other oxygenates, ExxonMobil does not maintain that the amendments to the CAA and the City's state tort claims are incompatible on their face.  Instead, it argues that due to the specific factual circumstances of this case (*i.e.*, that there was no safer, feasible alternative to MTBE), it was impossible for ExxonMobil to comply with federal requirements without using MTBE.[154]  This argument is problematic for two reasons.

---

grounds.

[154]    *See* ExxonMobil's Memorandum of Law in Support of Their Renewed Motion for Judgment as a Matter of Law, Or, in the Alternative, for a New Trial And/Or Remittitur ("ExxonMobil Mem.") at 5 ("In short: the evidence at trial proved – and the jury 's verdict confirms – that 'it would be impossible for the defendants to comply with both the state law sought to be imposed and the federal requirements because alternatives (*i.e.*, ethanol) were not 'available to the defendants for their use in the RFG Program.'" (quoting *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 614, 616 (S.D.N.Y. 2001)).

*First*, the "safer, feasible alternative design" products liability

standard is not equivalent to the "physical impossibility" preemption standard.  In

evaluating the feasibility of an alternative design, the finder of fact weighs the

costs and benefits of the marketed product against the costs and benefits of

proposed alternatives.[155]  This Court is unaware, and ExxonMobil has not cited,

any judicial opinion suggesting that physical impossibility in the federal

preemption context entails this sort of utilitarian analysis.  "That it may have been

*more convenient or less expensive* for the [ExxonMobil] to use MTBE does not

---

[155]     *See Cover v. Cohen*, 61 N.Y.2d 261, 266-67 (1984) ("In a strict
products liability action based upon design defect, whether the product as
marketed was reasonably safe for its intended use is determined by whether a
reasonable person with knowledge of the potential for injury of the product and of
the available alternatives, balancing the product's *risks against its utility and costs*
and against the *risks, utility and cost of the alternatives*, would have concluded
that it should not have been marketed in the condition that it was." (emphasis
added)); *Cuntan v. Hitach Koki USA, Ltd.*, No. 06 Civ. 3898, 2009 WL 3334363,
at *5 (E.D.N.Y. Oct. 15, 2009) ("[A] plaintiff must establish not only that a
different design would have led to improved safety, but also that adopting such a
design would be 'economically and technically feasible.'" (quoting *Ruthosky v.
John Deere Co.*, 651 N.Y.S.2d 717, 719 (3d Dep't 1997)); 63A Am. Jur. 2d Prods.
Liab. § 999 ("The essential inquiry is whether the design chosen was a reasonable
one from among the feasible choices of which the defendant was aware or should
have been aware. This feasibility is a relative, rather than an absolute, concept; the
more scientifically and economically feasible the alternative is, the more likely it
is that the product will be found to be defectively designed." (citations omitted)).
Indeed, the jury was instructed that it should consider "the usefulness and costs of
the alternative design as compared to the product the defendant did market." *See*
10/7/09 Tr. at 6611:24-6612:2.

-42-

mean it would have been *impossible* for [it] to use other, less-polluting additives."[156] Accordingly, the jury's feasibility determination does not establish impossibility.

*Second*, the burden of proof in the design defect context is inconsistent with the burden of proof in the federal preemption context. To prove its design defect claim, the City had the burden of showing that there were no safer, feasible alternative to MTBE.[157] By contrast, because federal preemption is an affirmative defense, the burden of proof is on the defendant, ExxonMobil.[158] Thus, the jury's finding that the City *failed to prove* there was a safer, feasible alternative cannot substitute for a finding that ExxonMobil *proved* that MTBE was the only oxygenate it could have used to satisfy the RFG requirements.

In addition, regardless of the jury's verdict, ExxonMobil did not submit evidence at trial sufficient to demonstrate that it was *impossible* to use

---

[156]     *In re MTBE Prods. Liab. Litig.*, 488 F.3d 112 (2d Cir. 2007) (emphasis added). *Cf. In re MTBE*, 457 F. Supp. 2d at 335 ("Impossibility does not depend on whether events in the physical world would have made it difficult to comply with both standards, but on whether the two standards are expressly compatible.").

[157]     *See* 10/7/09 Tr. 6610:7-13.

[158]     *See Village of DePue, Ill., v. Exxon Mobil Corp.*, 537 F.3d 775, 786 (7th Cir. 2008) ("Federal preemption is an affirmative defense upon which the defendants bear the burden of proof . . . .").

-43-

another oxygenate.  At most, as is consistent with the jury's feasibility finding,

ExxonMobil showed that it would have been more difficult for it to produce

reformulated gasoline containing ethanol (the most likely alternative to MTBE).[159]

It did not establish that it would have been impossible to do so.

### 2.    Obstacle Preemption

ExxonMobil also contends that permitting the verdict to stand will

frustrate Congress's intent "to promote the use of MTBE, and other

oxygenates."[160]  Defendants raised an essentially identical argument in seeking

summary judgment[161] – which I denied.  Because I do not find that the evidence

---

[159]    *See* ExxonMobil Mem. at 5 (highlighting testimony that "Exxon's
analysis of available oxygenates concluded that the [domestic] supply of both
MTBE and ethanol combined would be substantially short of industry-wide
demand under [RFG Program] requirements"; that "[g]asoline blended with
ethanol could not be transported by pipeline – the principal mode for distributing
gasoline from refineries in the U.S."; that "[r]efiners who shared common
distribution systems all had to use either MTBE or ethanol in areas served by those
systems"; and that "[t]he commercial viability of ethanol depended, in part, on
refiners being able to obtain a waiver from the EPA from volatility rules, which
was denied" (citations omitted)).

[160]    ExxonMobil Reply Memorandum of Law in Further Support of Their
Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a
New Trial or Remittitur ("ExxonMobil Reply") at 2

[161]    *See In re MTBE*, 457 F. Supp. at  339 ("Defendants also contend that
Congress intended to maximize the improvement of the air quality achievable
under the RFG Program, and that a duty not to use MTBE would be an obstacle to
this goal.").

submitted at trial alters that analysis, I decline to revisit that decision.

Although it is indisputable that Congress intended to promote the use of oxygenates in creating the RFG Program, there is no "indication that Congress or the EPA 'struck a particular' balance between water pollution and the ability of the [RFG Program] to expand"[162] or that "Congress or the EPA intended to protect the 'market share of MTBE even if it prove[d] to be inferior to other oxygenates due to environmental considerations other than motor vehicle emissions.'"[163] Accordingly, I found that allowing plaintiffs to recover damages for "inordinate environmental effects" caused by the use of MTBE does not conflict with federal policy.[164] Congress, in fact, considered including a safe harbor provision immunizing MTBE producers and distributors from state tort liability in the Energy Policy Act of 2005, but ultimately chose not to do so.[165] While this

---

[162]    *Id.* at 340-41 (quoting *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716 (1985)).

[163]    *Id.* at 339 (quoting *Oxygenated Fuels Ass'n, Inc. v. Pataki*, 158 F. Supp. 2d 248, 257 n.4 (N.D.N.Y. 2001)).

[164]    *Id.* at 340.

[165]    *See* 149 Cong. Rec. S15212 (daily ed. Nov. 20, 2003) (statement of Sen. Dianne Feinstein) ("Let me take up MTBE. In this bill, there is a liability waiver so nobody can sue for the fact that MTBE has been found to be defective by a court of law. Not only that, it is a retroactive liability protection for MTBE producers. This provision offers them immunity from claims that the additive is defective in design or manufacture. It makes this liability protection retroactive to

decision does not provide direct evidence of Congress's intent *at the time* it passed

the amendments to the CAA, it bolsters the inference that permitting the City's

state tort claims will not impede Congressional objectives.

The jury's finding that the City failed to prove that there was a safer,

feasible alternative to MTBE does not alter that determination. ExxonMobil

submitted evidence at trial showing that using ethanol would have been more

costly than using other oxygenates. The City's state tort claims simply provide a

counterbalancing economic incentive for ExxonMobil to decrease or eliminate the

use of MTBE because of its severe environmental effects. As discussed, Congress

did not intend to prohibit states from influencing the decision-making process of

gasoline companies choosing among oxygenates. Thus, the evidence submitted at

trial does not show that state tort claims will frustrate the objectives of

---

September 5 of this year thereby wiping out hundreds of lawsuits brought by local
jurisdictions all across America. This retroactive immunity is a perverse incentive
to those who pollute because it says to them, OK, you have done all of this
damage; nonetheless, it does not really matter. You do not really have any
liability. All these suits will be wiped out."); 151 Cong. Rec. H6949 (daily ed. July
28, 2005) (statement of Rep. Bart Stupak) ("I am happy that the 'safe harbor'
provisions for manufacturers of MTBE that were in the House bill were dropped.
Instead, there is a provision allowing lawsuits to be sent to Federal court if a
defendant wants to make a request to do so.").

Congress.[166]

Permitting the City's state tort claims to proceed may seem unfair – as ExxonMobil is being forced to compensate the City for doing something that it arguably would not have done in the absence of federal regulation. However, the touchstone of the doctrine of federal preemption is not fairness to the parties; it is Congressional intent. Without clear evidence that federal policy and state law are in sharp conflict, or that it would have been physically impossible to comply with federal and state requirements, a finding of preemption is inappropriate.

### B.    Affirmative Defense: Statute of Limitations

The City's claims are time barred if, prior to October 31, 2000, (1) there was a sufficient amount of MTBE in the groundwater within Station 6's capture zone to cause a reasonable water provider to remediate that contamination and (2) the City knew of that level of contamination. These were questions of fact on which ExxonMobil had the burden of proof. Accordingly, for ExxonMobil to

---

[166]    *Compare Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000) (finding that state tort claims were preempted when they would frustrate Congress's intent that car manufacturers have a choice among passive restraints) *with In re MTBE*, 457 F. Supp. 2d at 336-37 ("The CAA itself contains no language mandating that defendants have a choice among oxygenates. Congress intended the states to have flexibility in setting emissions standards as long as the state met the minimum threshold set by the RFG program. The most that can be shown from the text of the Act is that Congress intended to create a fuel neutral program." (citations omitted)).

be entitled to judgment as a matter of law, it must have been unreasonable for the

jury to find that ExxonMobil failed to prove both that the City was injured and that

the City was aware of that injury.

        At trial, ExxonMobil relied on two pieces of evidence to show that

the City's claims are time barred.  Neither of these is sufficient to establish that

ExxonMobil is entitled to judgment as a matter of law.  *First*, William Yulinksy,

the Director of Environmental Health and Safety for the Bureau of Wastewater

Treatment, testified that the City anticipated a need to build a treatment plant at

Station 6 as early as September 1999.[167]  However, as I explained in deciding

ExxonMobil's pre-trial motions, "[t]he design and construction costs of the Station

6 treatment plan is not the City's injury.  The *injury* is the contamination of the

City's groundwater. . . . [T]he design and construction costs are damages the City

seeks to recover in remediating the *injury.*"[168]  "Thus, in determining the

timeliness of the City's recurring injury claim, the question is not, as

[ExxonMobil] suggests, when the City first knew of its future damages, but rather

when the City was first injured by MTBE contamination in its water and first knew

      [167]    *See* 9/23/09 Tr. at 5781:24-5781:24-5782:15, 5772:25-5773:15, 5776:25-5777:4.

      [168]    *In re MTBE*, 2009 WL 2634749, at *3 (emphasis added).

-48-

that it was so injured."[169] The fact that the City anticipated a *future need* to build a
remediation facility is not conclusive evidence that the City's groundwater was
*already* contaminated at a level sufficient to injure the City or that the City knew
of that level of contamination.

    *Second*, City employees circulated internal memos in 1995 and 1997
suggesting that MTBE contamination was a growing concern as a potential
groundwater contaminant.[170] This evidence is equally inconclusive. A generalized
concern that MTBE contamination may pose problems for the City's water supply
does not show that MTBE contamination in the groundwater of Station 6 had
reached levels that would cause the City, as a reasonable water provider, to
remediate that contamination.

    To succeed on its statute of limitations, ExxonMobil was required to
prove by a preponderance of the evidence that the City was injured and that it
knew of that injury. Given the evidence introduced at trial, it was not
unreasonable for the jury to determine that ExxonMobil failed to meet that burden.

---

[169]     *Id.* at *4.

[170]     *See* 9/23/09 Tr. at 5752:23-5753:2, 5754:7-15, 5756:3-21, 5761:1-9
(Edward Kunsch).

-49-

## C.    Injury

New York law requires the City to show that it suffered an actual

injury to recover damages under most of its asserted causes of action.[171]

ExxonMobil raises numerous issues relating to whether the City's injury is legally

cognizable and whether the jury's finding that the City suffered an injury is

supported by the evidence introduced at trial.  I have already considered and

rejected many of these arguments in deciding ExxonMobil's pre-trial motions.[172]

---

[171]    *See Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)
(negligence); *Copart Indus. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 568-70
(1977) (nuisance); *Howard v. Poseidon Pools, Inc.*, 72 N.Y.2d 972, 974 (1988)
(failure to warn).  Nominal damages may be awarded for trespass in the absence of
proof of actual injury. *See Kronos Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95 (1993).

[172]    *See In re MTBE*, 2009 WL 2634749, at *4 ("[T]he City brings a
traditional recurring injury claim, which seeks past and future damages for a
recurring injury that has *already begun* and that will recur in the future. . . .
[W]hen the plaintiff brings a traditional recurring injury claim that seeks future
damages for a recurring injury that has *already begun*, the plaintiff must show
future damages only by a preponderance of the evidence and need not show that
the harm is imminent." (citing *In re MTBE Prods. Liab. Litig.*, No. 00 Civ. 1898,
2009 WL 1952497, at *6-*7 (S.D.N.Y. July 6, 2009)); *In re MTBE*, 643 F. Supp.
2d at 457-59(holding that the City's Station 6 claim is ripe and that the City has
standing to assert it); *id.* at 459 (holding that, under New York law, the City "may
recover for interference with use of [its] property provided that it actually intends,
in good faith, to make such use of the property." (quotation marks and citation
omitted)); 8/11/09 Tr. at 1018:2-1024:2 (denying ExxonMobil's motion to exclude
the proposed expert testimony relating to a capture zone model for Station 6); *In re
MTBE*, 458 F. Supp. 2d. at 158-59 (holding that whether the presence of MTBE in
groundwater at or below MCL is a legally cognizable injury is a question of fact
for the jury).

Because they are not affected by the evidence submitted at trial, I do not revisit

those determinations. However, I do consider three other issues raised by

ExxonMobil. *First*, ExxonMobil argues that the jury's finding that the MTBE

concentration in the combined outflow of the Station 6 wells will peak at ten ppb

lacked any evidentiary basis.[173] *Second*, ExxonMobil argues that the evidence

submitted at trial is insufficient to support the jury's finding that the City will be

injured by the predicted level of contamination.[174] *Third*, and finally, ExxonMobil

argues that the City failed to show that it has a "good-faith intent to begin

construction of Station 6 within the next [fifteen] years."[175]

### 1.   Jury's Determination that MTBE Concentration in the Combined Outflow of Station 6 Wells Will Be Ten PPB

The jury, in finding that the concentration of MTBE in the combined

outflow of the Station 6 wells will peak at ten ppb, did not adopt the conclusions

of Terry – the only expert witness *to quantify* the amount of MTBE that will be in

the Station 6 wells. While Terry opined that the concentration of MTBE would

peak at thirty-five ppb in 2024, the jury found that the concentration of MTBE

---

[173]   *See* ExxonMobil Mem. at 17-19; ExxonMobil Reply at 11-12.

[174]   *See* ExxonMobil Mem. at 19-20; ExxonMobil Reply at 12-13.

[175]   ExxonMobil Mem. at 21.

would peak at ten ppb in 2033. According to ExxonMobil, this disparity

demonstrates that the jury "ignored the only evidence quantifying the

concentration and timing of MTBE impacts to the Station 6 wells, and substituted

sheer speculation in its place."[176]  Because the jury was entitled to rely on Terry's

testimony without adopting his ultimate conclusions, I disagree.

As Terry explained to the jury, "[a] groundwater model is a tool" used

to *estimate* the amount of contaminant that will travel to a particular water source

on the basis of certain assumptions that are entered into that model.[177]  He

informed the jury that he was basing his prediction in Analysis 1 on specific

assumptions and that he "did not have perfect information" about MTBE

contamination in the geographic area surrounding Station 6.[178]  In addition, Terry's

Analysis 2 model showed a range of other possible peak concentrations on the

basis of different assumptions about the amount of MTBE gasoline that has been

spilled within the Station 6 capture zone. For example, if each recorded gasoline

spill released five hundred gallons of gasoline on average, the level of MTBE

concentration would peak at six ppb. While it is true that the jury did not select

---

[176]    *Id.* at 19.

[177]    8/18/09 Tr. at 1892:17-18.

[178]    8/19/09 Tr. at 2014:7-9.

any one of Terry's specific predictions, it did select from *within the range* of
possible outcomes suggested by Terry.

The parties disagree as to whether the jury could rely upon Terry's
model without adopting his specific conclusions as to the likely peak MTBE
concentration. In general, a jury is not required to choose between adopting or
rejecting an expert's testimony wholesale; it is free to accept or reject the expert's
opinions in whole or in part and to draw its own conclusions from it.[179] Because
juries are rarely asked to provide numerical predictions in the liability phase of a
trial, no court that either the parties or I have found has dealt with the precise issue
raised in this case. However, triers of fact are routinely asked to make numerical
assessments on the basis of expert testimony in the damages phase. In that
context, juries have been given significant latitude to alter the amount of damages
proposed by experts while still relying on the models developed by those

---

[179]   *See Berger v. Iron Workers Reinforced Rodmen, Local 201*, 170 F.3d
1111, 1121 (D.C. Cir. 1999) ("[The] trier of fact was free to accept or reject expert
testimony, and was free to draw his own conclusion.");  *Schroeder v. The Tug
Montauk*, 358 F.2d 485, 488 (2d Cir. 1966) ("[T]he expert evidence was
conflicting and it was within the province of the trial judge to weigh it and accept
or reject the whole or a part of it."));  *Meija v. JMM Audubon, Inc.*, 767 N.Y.S.2d
427, 428 (1st Dep't 2003) ("In considering the conflicting testimony of the parties'
respective expert witnesses, the jury was not required to accept one expert's
testimony over that of the other, but was entitled to accept or reject either expert's
position in whole or in part.").

experts.[180]  While a jury's task in the liability and damages phases do have

significant differences, the principle that expert evidence "is to be treated in the

same manner as other evidence in the case" applies whether the jury is

determining damages or predicting the amount of future contamination.[181]  The

role of an expert is to assist the jury by "providing the groundwork . . . to enable

the jury to make its own informed decision."[182]  It is not to usurp or invade the

jury's decision-making function.

The jury was given the difficult task of predicting how much MTBE

will be in the combined outflow of the Station 6 wells many years into the future

and it was not expected to return an answer reflecting scientific precision.  In fact,

the jury was permitted to choose  among several possible *ranges* of MTBE

---

[180]   *See Robinson v. Shapiro*, 646 F.2d 734, 744 (2d Cir. 1981) (affirming
a district court's refusal to grant a new trial when the jury awarded damages
greater than that calculated by plaintiff's expert "[b]ased on the [Second Circuit's]
review of the record and the cogent reasons set forth by the [trial] court in
explaining how the jury could reasonably have arrived at a larger figure than the
plaintiff's expert"); *Medcom Holding Co. v. Baxter Travenol Labs.*, 106 F.3d
1388, 1398 (7th Cir. 1997) (stating that a district court's finding that the jury was
unable to revise an expert's model to downwardly adjust the amount of damages
awarded "denigrates the historic and practical abilities of the jury.")).

[181]   *Merrill v. United Air Lines, Inc.*, 177 F. Supp. 704, 705 (S.D.N.Y.
1959).

[182]   *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

-54-

contamination rather than choosing an exact concentration level. Moreover, as discussed, Terry made clear that even his conclusion as to the likely peak concentration at Station 6 was an estimate based upon imperfect knowledge about real world facts. The jury scrutinized Terry's testimony, and, most likely finding that several of his express assumptions were inaccurate, selected a lower peak concentration than that suggested by Terry. This does not amount to impermissible conjecture or surmise, but a reasonable approach to a difficult question.

### 2.    Injury at Ten PPB

I have already held in prior decisions that whether contamination at or below the MCL injures the City is a question of fact for the jury. At trial, the City introduced several pieces of evidence to support the inference that a reasonable water provider in the City's position would treat the water in the Station 6 wells. For example, the City introduced testimony that twenty-five percent of the population can detect MTBE at three to four parts per billion,[183] that ten percent of the population can detect MTBE at one to two parts per billion,[184] that MTBE may

---

[183]    *See* 8/31/09 Tr. at 2889:18-22 (Harry Lawless).

[184]    *See id.*

be carcinogenic at low levels of exposure in drinking water,[185] and that if one or more of the Station 6 wells is taken offline for any reason the concentration of MTBE in the combined outflow of the remaining wells could spike to fifteen ppb or higher (a violation of the MCL).[186]  There is nothing unreasonable about the jury determining, on the basis of this evidence, that a reasonable water provider in the City's position would treat the water in the Station 6 wells.

### 3.    Good Faith Intent

ExxonMobil also argues that the jury did not have sufficient evidence to find that the City has a good faith intent to begin construction of the Station 6 facility within the next fifteen years.[187]  I disagree.  Kathryn Garcia, an Assistant Commissioner for Strategic Projects at the New York City Department for Environmental Protection, testified that the Station 6 wells would be used as a

---

[185]    *See, e.g.*, 9/2/09 Tr. at 3267:18-3267:24 (Kenneth Rudo).

[186]    *See* 9/24/09 Tr. at 5869:10-5861:20 (Marnie Bell).

[187]    *See* ExxonMobil Mem. at 21.  ExxonMobil also argues that because the City's claims are for the threat of injury, rather than an injury that has already occurred, the City must prove "that the threat is imminent and certainly impending."  *Id.* at 20 (citing *In re MTBE*, 175 F. Supp. 2d at 610.  However, as discussed, the City is injured when the *groundwater* within the Station 6 wells becomes contaminated with MTBE, not when that MTBE actually enters the Station 6 wells.  Thus, because the MTBE is already in the groundwater, the City has suffered an injury even though it has not yet turned on the Station 6 wells.

backup source of water if other pieces of infrastructure, such as aqueducts

currently in use, suffered an outage.[188]  Graham Fogg, a hydrogeology professor at

the University of California, Davis, testified that plumes of MTBE will remain in

the geographic vicinity of Station 6 for decades into the future.[189]  This testimony,

which the jury apparently credited, provides a sufficient basis for the jury to infer

that the City intends to use the Station 6 wells as a backup water source and that it

intends to build a treatment facility to ensure that it is able to use water from those

wells if and when needed.

### D.     Causation

The jury found ExxonMobil liable as both a manufacturer, refiner,

supplier and seller of gasoline containing MTBE and as a direct spiller of gasoline

containing MTBE.  ExxonMobil argues that the evidence introduced at trial does

not support that determination and that the jury was confused as to the traditional

principles of causation due to the Court's description of the commingled product

theory of causation in the jury charge.

### 1.     Insufficiency of the Evidence

---

[188]    *See* 8/5/09 Tr. at 420:9-421:19.  *See also* 8/6/09 Tr. 666:1-668:18
(William Meakin) (testifying that the City will use Station 6 to supply the public
with water in drought situations and during infrastructure repairs).

[189]    *See* 8/17/09 Tr. at 1561:18-1562:14.

-57-

At trial, the City relied on Terry's capture zone model to establish causation. As I explain below, combined with the other evidence submitted at trial, this capture zone model provided a sufficient basis for the jury to determine that ExxonMobil's conduct both as a manufacturer, refiner, supplier and seller of MTBE gasoline *and* as a direct spiller of MTBE gasoline was a substantial factor in causing the City's injury.

### a.    Manufacturer, Refiner, Spiller and Supplier

At trial, the City produced three pieces of evidence to show that ExxonMobil's conduct as a manufacturer, refiner, supplier and seller of gasoline containing MTBE was a substantial factor in injuring the City: (1) expert testimony that, due to the commingled nature of the gasoline distribution network, ExxonMobil gasoline would be present in nearly every UST within the Station 6 capture zone;[190] (2) expert testimony that ExxonMobil supplied approximately twenty-five percent of the gasoline sold in Queens;[191] and (3) testimony that, over

---

[190]    *See* 9/9/09 Tr. at 4103:6-4105:20 (Bruce Burke).

[191]    *See* 9/14/09 Tr. at 4281:8-11 (Martin Tallett). This testimony was based on data reflecting the supply of gasoline into New York state, as opposed to data reflecting the supply of gasoline into Queens county. However, the City's expert testified that there "are few reliable data available at the county level," *see id.* at 4281:19-20, and that the state data is the "best proxy," *see id.* at 4281:21, for determining ExxonMobil's market share in Queens because most of the gasoline that comes into New York state is "supplied into . . . New York City and the

time, all USTs leak.[192]  ExxonMobil's objection to the sufficiency of this evidence

focuses on the City's use of market share data.

   *First*, ExxonMobil argues that the City should not have been

permitted to use market share data because it disclaimed reliance on the market

share theory of liability.[193]  This argument conflates application of the market

share *theory of liability* with using market share *data* as circumstantial evidence of

causation.  Under the market share theory, liability is apportioned according to a

defendant's national market share even though it is assumed that the vast majority

of defendants in any one case did not injure the plaintiff.  The City, on the other

hand, sought to use market share data to show that "ExxonMobil . . . represented

such a substantial fraction of the total gasoline sold in the Queens area, that . . . it

was not only present, but present in such quantity at leaking stations" that it was

---

surrounding counties, . . . [including Queens]," *see id.* at 4282:1-4.  While the
New York state data is not a perfect substitute for data specific to Queens, it was
reasonable for the jury to determine that if ExxonMobil was supplying
approximately twenty-five percent of the gasoline to New York state, it was
supplying a substantial percentage of the gasoline entering Queens.

   [192]    *See* 8/12/09 Tr. at 1117:4-23 (Marcel Moreau); 8/13/09 Tr. at 1335:1-
21 (same); 8/14/09 Tr. at 1389:4-11, 1451:8-1452:2 (same).

   [193]    *See* ExxonMobil Mem. at 8-9.

more likely than not a cause of the City's injury.[194] While New York has severely

limited the circumstances in which the market share theory of liability may be

applied,[195] it has never suggested that market share data cannot be used to prove

traditional causation, and I find nothing unreasonable about the jury relying on

that data to find ExxonMobil liable.

Second, ExxonMobil argues that even if the use of this market share

data is permissible, a twenty-five percent market share cannot make it more than

twenty-five percent likely that ExxonMobil was a cause of the City's injury, and

thus, reliance on the market share data does not satisfy the preponderance of the

evidence standard.[196] This argument is incorrect. Given the commingled state of

gasoline entering Queens, ExxonMobil's twenty-five percent market share can

support the inference that Exxon-Mobil's conduct was *more likely than not* to

have caused twenty-five percent of the contamination in the Station 6 wells. The

jury was entitled to find that, by causing this significant portion of contamination

in the Station 6 wells, ExxonMobil's MTBE-containing gasoline was a substantial

---

[194]    City's Memorandum in Opposition to ExxonMobil's Renewed
Motion for Judgment as a Matter of Law, or, in the Alternative, for a New Trial
And/Or Remittitur ("City Opp.") at 12.

[195]    *See Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 241-42 (2001).

[196]    *See* ExxonMobil Mem. at 9-10.

factor in producing the City's injury.

### b.    Direct Spiller

To succeed on its direct spiller claims, the City was required to show that MTBE gasoline released from ExxonMobil-controlled stations was a cause of the City's injury at Station 6.  However, "[t]hat showing need not be made with absolute certitude nor exclude every other possible cause of injury."[197]  Instead, the City was only required to prove "facts and circumstances ... from which causation may reasonably be inferred."[198]

The City attempted to meet that burden at trial by introducing evidence of multiple spills at ExxonMobil-controlled stations within Terry's predicted capture zone and evidence that MTBE has escaped remediation efforts at many of those sites.[199]  ExxonMobil argues that Terry's capture zone model does

---

[197]    *Koester v. State*, 457 N.Y.S.2d 655, 658 (4th Dep't 1982) (citations omitted) (holding that the New York Court of Claims erred in holding that the absence of a curve sign on a ramp was not the proximate cause of driver's accident although the "claimant was aware of the general course of the ramp and the existence of the curve from having traveled over it on prior occasions during daylight hours, it was a dark night and he had just left a lighted highway and entered on the unlighted ramp")).

[198]    *Id.* (citations omitted).

[199]    *See* 8/13/09 Tr. at 1230:7-1267:1, 1267:1-1288:24, 1289:9-1301:1, 1308:2-25; 8/18/09 Tr. at 1756:7-24; 1781:1-6, 1806:14-1807:12, 1821:22-1822:16; 9/21/09 Tr. at 5229:11-5236:23; 5244:19-5244:20, 5253:19-5254:1.

not provide an adequate basis for proving direct spiller causation because it was based on the assumption that the Station 6 wells will pump water continuously from 2016[200] until 2040.[201]  According to ExxonMobil, that assumption conflicts with the jury's finding that "Station 6 will be used only as a backup source"[202] and is unsupported by the evidence.[203]

Regardless of this discrepancy, however, the jury could still reasonably have found that MTBE from ExxonMobil-controlled stations would impact Station 6.  At trial, a series of demonstrative maps depicting the evolution of Terry's predicted capture zone over time were shown to the jury.[204]  These maps, which were based on exhibits introduced at trial,[205] indicate that ExxonMobil-controlled stations are situated in nearly every direction from Station 6.  Moreover, several of these stations are close enough to Station 6 to be well

---

[200]    *See* 8/18/09 Tr. at 1906:8-10.

[201]    *See* 8/19/09 Tr. at 2155:11-2156:1.

[202]    ExxonMobil's Supplemental Brief in Response to the Court's Questions on Defendants' Post-Trial Motion at 18.

[203]    *See* ExxonMobil Mem. at 7; ExxonMobil Reply at 5.

[204]    *See* 9/23/09 Tr. at 5678:13-5681:13.

[205]    *See* Pl. Ex. 14845A-X; Pl. Ex. 14844A-C; Pl. Ex.  3167; Pl. Ex. 5582; Pl. Ex. 5583; Pl. Ex. 5584.

within the borders of Terry's predicted capture zone at every stage of its evolution (*i.e.*, even in the earliest stages of the assumed pumping schedule). The City, for example, introduced evidence that significant amounts of MTBE gasoline were spilled[206] at an ExxonMobil-controlled station, 113-21 Merrick Boulevard, located within a half-mile of Station Six.[207] In conjunction with Terry's (allegedly imperfect) capture zone model, this sort of evidence – *i.e.*, the existence of several ExxonMobil-controlled stations in close proximity to, and positioned radially in multiple directions from, Station 6 – provides a sufficient basis for the jury to reasonably infer that ExxonMobil's conduct as a direct spiller was a cause of the City's injury.

## 2.   **Jury Confusion**

ExxonMobil seeks a new trial on the ground that "[e]ven though the jury did not render a verdict on the commingled product theory . . . the erroneous commingled product theory so permeated the trial as to make it impossible for the jury to comprehend traditional causation."[208] Specifically, ExxonMobil suggests that the Court's instruction on the commingled product theory "impermissibly

---

[206]   *See* 9/21/09 Tr. at 5253:19-5254:1 (Thomas Maguire).

[207]   *See* 8/19/09 Tr. at 1977:4-6.

[208]   ExxonMobil Mem. at 10-11.

relieved the City of its burden to identify the defendant who caused its harm."[209]
This argument is without merit.

        *First*, as discussed, the commingled product theory of liability,
unlike the market share theory of liability, does not allow for the imposition of
liability against a defendant in the absence of a finding that the particular
defendant's product contributed to harming the plaintiff.  The market share theory
assumes that the vast majority of defendants did not actually contribute to the
harm incurred by a particular plaintiff (*i.e.*, all defendants supplying DES used to
treat women during pregnancy are held liable even if only one defendant
manufactured the DES pills that were ingested by the plaintiff).  The commingled
product theory, in contrast, requires a finding that the product of each and every
defendant held liable contributed to plaintiff's injury (*i.e.*, a defendant cannot be
held liable unless its gasoline was present in the commingled product that
contaminated plaintiff's groundwater).[210]

        *Second*, the jury was clearly instructed that the commingled product
theory is distinct from the traditional theory of causation and informed as to the

---

        [209]     *Id.* at 11 (citing *Hymowitz*, 73 N.Y.2d at 504 ("In a products liability
action, identification of the exact defendant whose product injured the plaintiff is,
of course, generally required.")).

        [210]     *See In re MTBE*, 644 F. Supp. 2d at 319.

nature of that difference.  For example, in describing the commingled product
theory, I instructed the jury:

> What sets [the commingled product theory] apart from
> manufacturer, refiner, supplier or seller causation is that to prove
> [causation under the commingled product theory], the [C]ity need
> not show that [ExxonMobil's] contribution taken alone would
> have injured the [C]ity.[211]

There is no indication that the jury did not understand this instruction.[212]

      *Third*, the jury was entitled to consider testimony that the gasoline

supplied to Queens was commingled in determining whether ExxonMobil's

gasoline injured the City under traditional principles of causation.  The fact that

ExxonMobil gasoline was spread throughout the gasoline distribution network in

Queens increases the probability that ExxonMobil gasoline was in the USTs that

leaked gasoline into the Station 6 capture zone.[213]  Evidence of commingling was

therefore relevant even if the jury did not ultimately reach the commingled product

---

[211]    10/7/09 Tr. at 6608:19-23.

[212]    *See United States v. Witten*, 610 F.3d 168, 191 (2d Cir. 2010) ("We
presume that juries follow instructions . . . .") (citing *Richardson v. March*, 481
U.S. 200, 206 (1987) (juries are presumed to follow instructions)).

[213]    *See O'Brien v. National Gypsum Co.*, 944 F.2d 69, 72-73 (2d Cir.
1991) ("Given testimony that asbestos products were used interchangeably on
virtually all of the warships under construction in the Navy Yard, [plaintiff's]
disease might reasonably be attributed in part to exposure to [defendant's]
products." (emphasis added)).

theory of causation.

### E.   Juror Misconduct: Extra-Record Information

During the jury's Phase III deliberations, I learned that a member of the jury had performed limited Internet research relating to this case. ExxonMobil argues that I erred in not declaring a mistrial on the basis of this juror's misconduct.[214] Search engines have indeed created significant new dangers for the judicial system. It is all too easy for a juror to find out more than he or she should by typing a few carefully chosen words into a search engine.[215] Nevertheless, in

---

[214]   *See* ExxonMobil Mem. at 27-29.

[215]   This has become a recurring problem. *See, e.g.*, Christina Hall, Facebook Juror Gets Homework Assignment, The Detroit Free Press, Sept. 2, 2010 (reporting that a Michigan juror who posted on Facebook that a defendant was guilty before the completion of trial was dismissed from the jury, held in contempt of court, ordered to pay a $250 fine and required to write a five page essay on the defendant's Sixth Amendment right to a jury trial); Noeleen G. Walter, Access to Internet, Social Media by Jurors Pose Challenges for Bench, N.Y. L.J., Mar. 3, 2010 (reporting that a state trial court in the Bronx determined that a woman breached her obligations as a juror by sending a Facebook "friend" request to a government witness but rejected the defense's argument that this act had tainted the jury's guilty verdict); Andrea F. Siegel, Judges Confounded by Jury's Access to Cyberspace: Panelists Can Do Own Research on Web, Confer Outside of Courthouse, The Balt. Sun, Dec. 13, 2009 (discussing the increasing trend in Maryland courts of defendants seeking a mistrial on the ground that one or more of the jurors conducted Internet research about the defendant's case while the trial was ongoing);  Debra C. Weiss, Juror Whose Revelation Forced a Mistrial Will Pay $1,200, A.B.A. J., Oct. 13, 2009 (reporting that a New Hampshire juror charged with contempt of court for revealing during deliberations that the defendant was a convicted child molester pleaded guilty to a reduced charge and

agreed to pay $1,200 to reimburse the county for expenses related to two days of deliberations); Daniel A. Ross, Juror Abuse of the Internet, N.Y. L. J., Sept. 8, 2009 (examining the problem of "Internet-tainted" juries across the United States and abroad); John Schwartz, As Jurors Turn to Web, Mistrials Are Popping Up, N.Y. Times, Mar. 18, 2009 ("It might be called a Google mistrial. The use of BlackBerry's and iPhones by jurors gathering and sending out information about cases is wreaking havoc on trials around the country, upending deliberations and infuriating judges."). In response to this problem, the Judicial Conference Committee on Court Administration and Case Management has recently recommended the following charge:

Before Trial:

You, as jurors, must decide this case based solely on the evidence presented here within the four walls of this courtroom. This means that during the trial you must not conduct any independent research about this case, the matters in the case, and the individuals or corporations involved in the case. In other words, you should not consult dictionaries or reference materials, search the Internet, websites, blogs, or use any other electronic tools to obtain information about this case or to help you decide the case. Please do not try to find out information from any source outside the confines of this courtroom.

Until you retire to deliberate, you may not discuss this case with anyone, even your fellow jurors. After you retire to deliberate, you may begin discussing the case with your fellow jurors, but you cannot discuss the case with anyone else until you have returned a verdict and the case is at an end. I hope that for all of you this case is interesting and noteworthy. I know that many of you use cell phones, Blackberries, the Internet and other tools of technology. You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends. You may not communicate with anyone about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, through any blog or website, through any Internet chat room, or by way of any other social networking websites, including Facebook, My Space,

this instance, the jury was not too polluted by the receipt of extra-judicial

information such as to prevent it from rendering a fair verdict based on the

evidence introduced at trial.

It is axiomatic that juries are required to decide cases on the evidence

introduced at trial. However, a new trial is not required solely because the jury

was *exposed* to extrinsic information.[216]  "'The issue, as Judge [Henry] Friendly

observed, is 'not the mere fact of [jury] infiltration . . . but the nature of what has

_____

LinkedIn, and YouTube.

At the Close of the Case:

During your deliberations, you must not communicate with
or provide any information to anyone by any means about this case. You
may not use any electronic device or media, such as a telephone, cell
phone, smart phone, iPhone, Blackberry or computer; the Internet, any
Internet service, or any text or instant messaging service; or any Internet
chat room, blog, or website such as Facebook, My Space, LinkedIn,
YouTube or Twitter, to communicate to anyone any information about
this case or to conduct any research about this case until I accept your
verdict.

Judicial Conference Committee on Court Administration and Case Management,
Proposed Model Jury Instructions: The Use of Electronic Technology to Conduct
Research on or Communicate about a Case (December 2009).

[216]    *See Manley v. AmBase Corp.*, 337 F.3d 237, 252 (2d Cir. 2003).

-68-

been infiltrated and the probability of prejudice.'"[217] While a court may question a

jury about what they learned in making this determination, after deliberations have

begun, it is inappropriate for a "court [to] inquire into the degree upon which the

extra-record information [is being] used in deliberations and the impression which

jurors actually ha[ve] about it."[218] "Rather, courts must apply an objective test

focusing on two factors: (1) the nature of the information or contact at issue, and

(2) its probable effect on a hypothetical average jury."[219]

Because the jury was not exposed to evidence that would prejudice

the average juror, it was not error to deny ExxonMobil's motion for a mistrial.

Juror No. 8, who clearly obtained improper information during Phase III

deliberations was immediately excused after the Court learned of his misconduct.

The jury brought this fact to my attention soon after they became aware of it and

the remaining jurors appeared candid and forthcoming in answering my questions

about the information they had learned. Although Juror No. 8 initially painted a

picture of a jury that was engaging in rampant outside research, his assertion that

---

[217]    *Id.* (quoting *United States ex rel. Owen v. McMann*, 435 F.2d 813,
818 (2d Cir. 1970)).

[218]    *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002) (quotation
marks and citations omitted).

[219]    *Manley*, 337 F.3d at 252 (quotation marks and citations omitted).

'everybody was doing it' was nothing more than the defensive tactic of a juror

looking for cover after he had been caught with his hand in the proverbial cookie

jar. When he and the other jurors were questioned further, it became apparent that

the limited information Juror No. 8 had communicated to them was decidedly

vague.

Juror No. 11 learned that there was going to be a fourth phase of the

trial – which he described as "some other penalty part."[220] Although the punitive

damages phase is often separated from the liability phase because plaintiffs are

permitted to introduce evidence in the punitive damages phase that is irrelevant in

the liability phase,[221] mere knowledge of a possible penalty phase is insufficient to

create prejudice. Indeed, when the jury was charged on Phase III of this trial, it

was given detailed instructions on how to calculate compensatory damages. If

such instructions (which are commonly given) are not deemed to prejudice the

jury's deliberations, then neither should a juror's vague knowledge that there may

---

[220]    10/9/09 Tr. at 6808:4-6.

[221]    *Compare Disorbo v. Hoy*, 343 F.3d 172, 189 n.9 (2d Cir. 2003)
(stating that evidence of a defendant's financial situation should be admitted in the
punitive damages phase of a trial because one of the purposes of punitive damages
is deterrence) *with Tesser v. Board of Educ. of School Dist. of City of N.Y.*, 370
F.3d 314, 318 (2d Cir. 2004) (stating that evidence of a defendant's wealth is
generally inadmissible in cases not involving punitive damages).

-70-

be a further penalty phase.

Juror No. 5 learned that ExxonMobil was the only remaining defendant in this case and that many of the other defendants had settled for approximately one million dollars each. The jury, however, was already well aware from the evidence introduced at trial, as well as from this Court's instruction that it must apportion liability among all responsible oil companies operating in the area surrounding Station 6, that other oil companies had caused contamination at Station 6. As such, a juror could easily make the connection that these other defendants had settled without being informed that this was the case by another juror who claimed to have obtained information from the Internet. Moreover, Juror No. 5's knowledge of these supposed settlements was so limited and vague that it would be highly unlikely to have prejudiced the average juror's deliberative process.[222]

In addition, two other jurors performed some limited outside research on their own. Juror No. 4 tried to drive over to Station 6, but failed to find it. Juror No. 6 looked me up on Wikipedia and read an article about water contamination caused by coal companies. As with the information shared by Juror

---

[222]      Juror No. 6 also recalled Juror No. 8 making some equally vague comments about plaintiffs receiving money in other MTBE cases.

No. 8, the jury's exposure to this information does not warrant a mistrial.

Although it was inappropriate for Juror No. 4 to attempt to find Station 6, his

failure to actually find that site prohibits any inference of prejudice. As for Juror

No. 6 – the information which she uncovered had only a tangential relationship to

this case. Jurors do not enter the courtroom as blank slates and the addition of this

limited information to Juror No. 6's mix of knowledge cannot reasonably be

deemed prejudicial.

### F.    Dismissal of Alleged Holdout Juror

ExxonMobil argues that a new trial is warranted because the "Court

erred in dismissing Juror [No.] 2, rather than declaring a mistrial, when it was

revealed that she was threatened for being a holdout."[223]  ExxonMobil did not

object to the removal of Juror No. 2 at any point until it filed its post-trial motions.

In fact, at the time of removal, ExxonMobil agreed that the Court should excuse

Juror No. 2.[224]  Because it would be patently unfair to allow ExxonMobil to object

to a decision by this Court (the dismissal of Juror No. 2) that it previously

---

[223]    ExxonMobil Mem. at 29.

[224]    Although ExxonMobil did subsequently move for a mistrial, it did so
on entirely different grounds – *i.e.*, when it discovered that "an actual instrument
[*i.e.*, the fork] was used in the jury room . . . ." 10/16/09 Tr. at 7022:14-17.
ExxonMobil never suggested that it viewed Juror No. 2 as a holdout juror or
intimate the view that Juror No. 2 should not be dismissed.

-72-

endorsed only after it received an adverse verdict, ExxonMobil has waived its right to make this objection.[225] If ExxonMobil believed that Juror No. 2 was being forced off of the jury because she was a holdout, it should have objected to her removal when the evidence allegedly supporting that inference arose.

## G.    Remaining Liability Issues

ExxonMobil has also raised a series of issues relating to: (1) the jury's findings of liability on the City's failure to warn,[226] negligence,[227] public nuisance,[228] and trespass claims[229]; and (2) several evidentiary rulings.[230]  Having reviewed the record thoroughly, and considered all of ExxonMobil's submissions, I find that these arguments – many of which have previously been considered by

---

[225]    *See U.S. v. Desir*, 273 F.3d 39, 43 (1st Cir. 2001) ("[A] defendant who has knowledge of juror misconduct or bias at the time of trial waives such a claim by failing to raise it until after trial."); *Dunn v. Denk*, 54 F.3d 248, 251 (5th Cir. 1995) (holding that a defendant waived an objection when he knew of juror misconduct "but chose to remain to silent until the return of an adverse verdict"); *U.S. v. Breit*, 712 F.2d 81, 83 (4th Cir. 1983) ("A defendant who remains silent about known juror misconduct – who, in effect, takes out an insurance policy against an unfavorable verdict – is toying with the court.").

[226]    *See* ExxonMobil Mem. at 12-13.

[227]    *See id.* at 21-23.

[228]    *See id.* at 23-24.

[229]    *See id.* at 24-27.

[230]    *See id.* at 31-37.

-73-

this Court – are without merit.

## H.    Damages

ExxonMobil argues that the jury's damages award warrants a new

trial on damages, or, in the alternative, remittitur.[231]  ExxonMobil points to three

purported errors in Bell's testimony[232] – which provided the basis for the jury's

award.[233]  None of these alleged errors are sufficient to warrant a new trial on

damages or remittitur.[234]

---

[231]    *See id.* at 37-45.

[232]    *See id.* at 42-43.

[233]    *See Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.3d
326, 337 (2d Cir. 1993) ("We have found remittitur appropriate in at least two
distinct kinds of cases: (1) *where the court can identify an error that caused the
jury to include in the verdict a quantifiable amount that should be stricken,* . . .
and (2) more generally, where the award is 'intrinsically excessive' in the sense of
being greater than the amount a reasonable jury could have awarded, although the
surplus cannot be ascribed to a particular, quantifiable error." (quotation marks
and citations omitted) (emphasis added)).

[234]    Although courts generally look to damages awards in other similar
cases to determine if an award is excessive, due to the factual uniqueness of this
case, the parties have not uncovered any verdicts that can act as an appropriate
benchmarks.  For comparison's sake, ExxonMobil notes that "the City previously
addressed MTBE contamination in five wells, readied for use in a drought
emergency, by installing [remediation] units at a total cost of [$3,160,000], or
approximately $632,000 per well." ExxonMobil Mem. at 42 (citing 9/24/09 Tr.
5962:4-6 (Marnie Bell)).  The City, in contrast, points out that three gasoline
companies in a California case agreed, for purposes of settlement, that the cost of
constructing and operating a water treatment facility serving five contaminated
wells will cost approximately $220,050,000. *See* City Opp. at 42.  As the parties

*First*, ExxonMobil argues that Bell's capital cost estimate of
$59,990,000 was unreasonable given that she had estimated that cost at $9.9
million in 2004.[235]  However, Bell was cross-examined on this point at trial and
testified that she had altered the estimate for a number of reasons – including
inflation, the escalation of prices of certain raw materials and a change in
design.[236]  The jury was entitled to accept that explanation.

*Second*, "the jury implausibly credited [] Bell's dubious testimony
that certain equipment will require replacement every 20 years, regardless of
whether that equipment is used or for how long."[237]  Bell opined at trial that the
equipment used at Station 6 will likely deteriorate even if it lays fallow.[238]  As
anyone who has left a piece of machinery, such as an automobile, idle for a long
period of time is aware, there is nothing unreasonable about the inference that
such equipment can become corroded and require replacement parts.  Accordingly,

---

agree, because these cost figures were not adopted by juries after a civil trial, they
provide limited guidance as to the appropriate award in this case.

[235]    *See* ExxonMobil Mem. at 39, 43.

[236]    *See, e.g.*, 9/30/09 Tr. at 6036:17-20, 6044:20-23, 6045:1-7, 6045:15-
19.

[237]    ExxonMobil Mem. at 43.

[238]    *See* 9/30/09 Tr. at 6023:16-18.

-75-

I cannot find that the jury acted in error by crediting Bell's testimony that

equipment at Station 6 will have to be replaced twice over the forty year period it

will be in use.

   *Third*, ExxonMobil argues that "the jury inappropriately awarded

$141 million for [operating and maintenance] costs based on nothing more than

the *ipse dixit* statements of [] Bell and her speculative assumption that Station 6

will operate continuously for 40 years."[239]  The City introduced evidence at trial

that the Station 6 wells will also be used to fulfill the public's water needs in

emergency drought situations or if presently unforeseen infrastructure repairs

become necessary.[240]  Because there is no sure way to estimate how likely these

emergencies are to occur, and thus, how often the City will need to use the Station

6 wells, it was not unreasonable for Bell, in assessing damages, to assume that the

wells will operate continuously.  Indeed, it is appropriate that the wrongdoer

(ExxonMobil) rather than the innocent party (the City) should bear the risk that

these emergencies will occur frequently.  As Bell explained, she assumed the wells

---

[239]  ExxonMobil Mem. at 42-43.

[240]  However, the only *planned* infrastructure project requiring use of the
Station 6 wells is the repair of an aqueduct (the Rondout-West Branch tunnel)
used to supply the City with drinking water – which will take approximately four
years. *See* 8/6/09 Tr. 701:9-15 (Steven Lawitts).

-76-

would run continuously for forty years because, for planning purposes, the City needs to presume the "worst-case scenario."[241]  The jury did not act unreasonably in accepting this explanation and adopting Bell's operating and maintenance costs.

Accordingly, because I conclude that the jury's damages award did not contain specific, quantifiable errors, I reject ExxonMobil's request for a new trial on damages, or in the alternative, remittitur.

## VI.   CONCLUSION

For the aforementioned reasons, ExxonMobil's post-trial motion is denied.  The Clerk of Court is directed to close this motion (Docket No. 610).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              September 7, 2010

---

[241]    9/30/09 Tr. at 6019:1-2. *Accord id.* at 6017:20-22 ("Again, for the purposes of designing costing, the only reasonable assumption to make was to assume it would operate continuously.").

## -Appearances-

### Liaison Counsel for Plaintiffs:

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York  10038
(212) 558-5500

### Counsel for Plaintiff City of New York:

Victor M. Sher, Esq.                     Susan Amron
Todd E. Robins, Esq.                    Daniel Greene
Joshua G. Stein, Esq.                    Assistant Corporation Counsel
Nicholas G. Campins, Esq.           100 Church Street
Marnie E. Riddle, Esq.                  New York, New York  10007
Sher Leff LLP                               (212) 788-1568
450 Mission Street, Suite 400
San Francisco, California  94105
(415) 348-1568

### Liaison Counsel for Defendants and Counsel for Exxon Mobil Corporation:

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York  10173
(212) 547-5583